UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAYLOR HANSEN,

     Plaintiff,

v.

AM GENERAL, LLC,

     Defendant.

Case No. 13-cv-12750
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANT AM GENERAL, LLC'S
MOTION FOR SUMMARY JUDGMENT [16]**

---

This breach of contract case is before the Court on Defendant AM General's Motion for Summary Judgment. (Dkt. 16.) Plaintiff Taylor Hansen (formerly Taylor Holland) worked for nonparty General Engine Products, LLC ("GEP"), a subsidiary of Defendant AM General, LLC, as an engineer. After being admitted for an Executive Masters of Business Administration program at the Northwestern University Kellogg School of Business, Hansen applied to receive tuition reimbursement through GEP's Education Financial Assistance Program ("EFAP"). GEP's EFAP is governed by the same policy as AM General's. Kelly Burton, a Human Resources Manager for both AM General and GEP, informed Hansen that he was approved for "about $25,000" worth of funding. Hansen was disappointed with this cap as he claims he was under the impression that he would be reimbursed for full tuition based on prior conversations with his supervisors. Hansen decided to pursue his degree at Northwestern and incurred tuition expenses of approximately $130,000. GEP reimbursed him for $21,970.

Hansen now seeks the rest of his Northwestern tuition from AM General, citing the EFAP Policy as an alleged contract that offers unlimited reimbursement for salaried employees'

education expenses. In the alternative, Hansen asks the Court to apply promissory estoppel based on GEP's alleged promise to pay his entire tuition and his alleged detrimental reliance on that promise in completing the EMBA program.

Hansen faces a threshold issue on the breach of contract claim: he sued AM General, GEP's parent company, rather than GEP itself. Yet the contractual relationship he alleges is with GEP. Because he has not demonstrated facts that would allow him to pierce through GEP to AM General, his breach of contract claim fails. Sensing this defect, Hansen requested leave to amend to add GEP as a defendant in his response to AM General's Motion for Summary Judgment. But the Court finds that Hansen has acted with undue delay in making this request, allowing amendment now would create prejudice, and that granting leave to amend would be futile. Hansen's promissory estoppel claim does not depend on his status as an employee, but rather on representations made by AM General employees to him. Nonetheless, this claim also fails because there was no clear and definite promise to reimburse him for the entirety of his Northwestern tuition. The Court will therefore GRANT AM General's Motion for Summary Judgment and DENY Hansen leave to amend the Complaint.

## I.  FACTUAL BACKGROUND

The following facts are undisputed for the purpose of AM General's motion unless otherwise indicated.

Plaintiff Taylor Hansen, an engineer, began working at General Engine Products, LLC in Livonia, Michigan, in 2001. (Dkt. 16-2, Taylor Hansen Deposition [hereinafter "Hansen Dep."], at 9.) GEP, which is not a party to this case, is a wholly owned subsidiary of Defendant AM General, LLC. (Dkt. 16-4, Mark Minnie Declaration [hereinafter "Minnie Decl."], at ¶ 4.) AM General and GEP maintain separate financial records and bank accounts and have separate

operating agreements. (*Id.* at ¶¶ 5, 15–17.) But AM General provides certain administrative services to GEP through a management agreement and GEP adopted AM General's Education Reimbursement Program policy ("the Policy") for its employees. (*Id.*) The Policy was "designed to benefit both the employee and AM General by encouraging participation in approved courses of study offered by accredited educational institutions." (Hansen Dep. Ex. 20, AM General Policy Manual [hereinafter "the Policy"], at 1.) Any reimbursement through this program for GEP employees, however, came from GEP's budget and not AM General's. (Minne Decl. at ¶ 14.)

The Policy states, in relevant part:

> AM General will refund tuition and compulsory fees in those instances where courses meet the requirements stated in this policy. . . . All regular, full-time employees are eligible to participate in the Education Reimbursement Program.

(Hansen Dep. Ex. 20, Policy, at 1.)

The Policy places restrictions on funding approval. Most importantly, employees who seek reimbursement for courses must apply for it in advance of each academic term:

> Eligible employees must complete the Application for Approval – Education Financial Assistance program Form (Exhibit A) and submit it to the Vice President, Human Resources prior to registration. All courses must receive approval by Human Resources prior to registration or reimbursement will not be made at time of course completion.

(Policy at 3.)

Further, under the Policy, "Participants pursuing graduate study are limited to two courses per academic term. . . . Requests for exceptions to the above guidelines should be made in writing to the Vice President Human Resources." (Policy at 2.) The Vice President of Human Resources at AM General is currently Mark Minne. (Minne Decl. ¶ 2.) AM General's "Statement of Conditions," as it existed during the relevant time period, added that "salaried employees have

3

no refund limit for approved courses completed during a calendar year at an accredited college, university, or institution organization having professionally accredited standards approved by the Company." (Policy at 6.) The "Statement of Conditions" says that the "Company shall make all decisions relating to the interpretation and administration of this Program." (Policy at 7.) The Policy does not define the term "Company." (*See generally id.*)

The usual application of the Policy is somewhat in dispute. AM General HR Director Mark Minne states that typically, AM General would provide to individual employees about $25,000 in reimbursement for MBA degree programs near the company's Livonia, Michigan and South Bend, Indiana facilities. (Minne Decl. at ¶ 11.) AM General also provided consistent payroll records of tuition reimbursements made to employees from December 2001 through December 2013. (*See* Minne Decl. Ex. 1.) Hansen counters by pointing to HR representative Kelly Burton's testimony that "no salaried employee before or since [Hansen] has ever been subjected to any predetermined cap on a tuition reimbursement claim or 'average cost' reimbursement." (Pl.'s Resp. Br. at 10 (citing Dkt. 20-2, Kelly Burton Deposition [hereinafter "Burton Dep."] at 48–49).)[1]

In 2007, Hansen applied and was accepted to Northwestern University's Kellogg School of Business and the University of Michigan's Ross School of Business. (Hansen Dep. at 11, 93.) He applied to Executive MBA programs rather than part-time MBA programs at both schools because the "EMBA" programs offered more flexibility due to their more compressed schedule of weekend classes. (Hansen Dep. at 58.) The application requirements included a "letter of support" from his employer. Hansen provided a sample "letter of support" to Minne and noted

---

[1] Hansen also asserts that Gary Wuslich, a former Vice President of Human Resources, attended Northwestern University for a program and received full reimbursement. (Pl.'s Resp. Br. at 9.) However, he does not cite any record support for this assertion.

that Minne should "modify the letter as necessary. For example, instead of indicating full tuition support, you could instead indicate, equivalent tuition of the evening MBA program." (Dkt. 20-3, Note to Mark Minne, at 1.) Burton mailed a "letter of support" to both institutions that read as follows:

> I have reviewed material describing the Executive Master's Program at Northwestern University's Kellogg School of Management and wish to verify that AM General LLC would like to support Taylor [Hansen] in your class to be admitted in July of 2007. As Manager of Human Resources for AM General LLC – Livonia, I certify that AM General[2] will work with Mr. [Hansen] to allow time away from work as described in the Kellogg brochure and to reimburse Taylor [Hansen] for tuition and fees pursuant to our Tuition Reimbursement policy.

(Dkt. 20-4, Fax to Julie Cisek Jones, at 2.)

While Hansen was applying to these programs, he was under the impression that AM General would cover his entire tuition for an EMBA. (*E.g.* Dkt. 20-3, Nov. 3, 2005 E-mail to Renee Lewandowski, at 1.) He had been discussing the reimbursement program with Kelly Burton, but Minne (now Vice President of Human Resources) got involved when it became apparent that Hansen was seeking "an extremely high amount of tuition reimbursement–about $130,000–to attend a school [Kellogg] that AM General and GEP employees do not usually attend." (Minne Dep. ¶ 13.)

On June 20, 2007, before Hansen's acceptance to Kellogg, Kelly Burton called to inform him that Mark Minne would be placing a $25,000 limitation on his tuition reimbursement. (Hansen Dep. at 33, 48; Hansen Dep. Ex. 3, E-mail to Jeff Dowell , at 1 ("Kelly informed me this morning that Mark Minne told her my EMBA sponsorship amount will be a flat $25,000.").) On August 7, 2007, Burton confirmed to Kellogg staff that "General Engine Products will

---

[2] Burton clarified in a subsequent e-mail to Kellogg staff that GEP, rather than AM General, would pay the reimbursement. (Burton Dep. Ex. 15, Aug. 7, 2007 E-mail to b-birt@kellogg.northwestern.edu [hereinafter Kellogg E-mail], at 1.)

support Taylor in his endeavor for an EMBA by allowing him the time needed for class, as well as a monetary contribution of what we would contribute for a part time MBA. That is the equivalent of about $25,000." (Burton Dep. Ex. 15, Aug. 7, 2007 E-mail to b-birt@kellogg.northwestern.edu [hereinafter Kellogg E-mail], at 1.) Burton and Minne say that this amount was based on the average cost of MBA programs in the Livonia and South Bend areas. (Burton Dep. at 25; Minne Decl. at ¶ 12.)

Hansen did not feel that a cap on tuition was consistent with the company's written policy. (*Id.* at 36.) As a result, Hansen sought more information regarding the cap. He asked his direct supervisor, Jeff Dowell, and Bob Gula, Vice President of Engineering at AM General and GEP, to discuss the cap with him. (Hansen Dep. at 38.) These discussions would continue through 2011. (*Id.* at 39.) Hansen admits that at no time did Gula tell him that the company would pay more than $25,000. (*Id.* at 43.)

Though he had submitted deposits to both Ross and Kellogg, Hansen eventually decided to attend Kellogg. (Hansen Dep. at 59, 97.) The cost for an EMBA through Kellogg was then $135,000. (Dkt. 20-4, Kellogg Admission Letter.) Kellogg followed the trimester system. Documents in the record indicate that the cost-per-course was $4,394 for the 2007–2008 and 2008–2009 academic years and $4,679 for the 2008–2009 academic year. (*See* Dkt. 16-2, Course Documentation.) Hansen applied for a federal student loan for the 2007–2008 school year. (Hansen Dep. Ex. 19.) Because the $25,000 cap seemed to him to be an "arbitrary number," but without receiving any assurances from his supervisors that anything more would be provided, he wrote in his loan application to Kellogg that he expected his employer to contribute $43,940 to his expenses that year. (Hansen Dep. at 106.) He requested a Federal Stafford Loan of $20,500 to take care of the rest of his expenses. (Hansen Dep. Ex. 19.) At no time did Hansen follow the

6

Policy's requirement that requests for reimbursement for more than two courses in a semester be submitted in writing to the Vice President of Human Resources. (Hansen Dep. at 113.) He felt that Burton's representation that the company would give him time off "trump[ed] this course load discussion." (*Id.*) He admitted, however, that no one in the company explicitly told him that this was true. (*Id.*)

Hansen attended Kellogg from Fall 2007 to Spring 2009 and received his diploma on June 19, 2009. (Dkt. 20-4, Northwestern Tr. and Diploma.) Because of his status in the EMBA program, he took 28 credits rather than the 20 credits that would have been required for a part time program. (Hansen Dep. at 95.) During this time, he continued to turn in applications, at the end of each trimester, for funding approval. (Dkt. 16-10, Jones Decl., at ¶ 4.) HR Generalist Shelby Jones received some of these forms and declares that "[e]ach time Mr. Hansen turned in these forms, he said he knew that he would not be reimbursed, but he was turning in the forms because he wanted Human Resources to keep track of the classes he was taking." (*Id.* ¶ 5.) Jones testified that none of the forms bore a signature by Hansen's supervisors or any HR official. (*Id.*)

Throughout his enrollment, Hansen attempted to enforce what he believed to be the true terms of the tuition reimbursement policy: that there was "no limit for salaried employees." (Hansen Dep. at 142.) For example, in August 2008, Hansen e-mailed his supervisor Jeff Dowell to ask if Dowell had "gotten any feedback on [his] latest pitch regarding tuition reimbursement." (*Id.*) He proposed that GEP pay "Tuition only for all 28 courses" in the program at a rate of $4,394 per course for the 2007–2008 term and $4,679 per course for the 2008–2009 term, (Hansen Dep. Ex. 9), but admitted that no one at AM General or GEP agreed to this proposal. (Hansen Dep. at 75.) In July 2010, Hansen e-mailed Gary Wuslich "seeking tuition-only reimbursement for 28 MBA courses, paid at Northwestern U's part-time tuition rate. That total is

$127,022, less $26,363 already reimbursed by the Company – for a balance of $100,658." (Dkt. 20-4, July 19, 2010 E-mail to Gary Wuslich, at 2.) It is unclear whether Wuslich responded to this e-mail.

Despite his ongoing efforts to secure more than $25,000 in reimbursement, in a January 20, 2009 fax to Kellogg, Hansen acknowledged that "my employer is not expected to provide any funding for the 2008/2009 school year." (Hansen Dep. 146.) He also testified that "[t]he most [expected reimbursement] that had been stated to me was $25,000." (Hansen Dep. at 147.) Nor did any AM General or GEP employee state that he would be reimbursed over $100,000, either orally or in writing. (*Id.* at 159.) Finally, in May 2011, Bob Gula told Hansen that there would be no further reimbursements. (Hansen Dep. 175.) Hansen accepted this statement and did not pursue the matter further within AM General or GEP. (*Id.* at 176.)

More than 3 years after completing the Kellogg program, Hansen was laid off as part of a reduction in force in November 2012. (Minne Decl. ¶ 18.) He filed a two-count Complaint for breach of contract and promissory estoppel against AM General in state court, which AM General removed to this Court on June 21, 2013. (Dkt. 1.)

## II. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## III. ANALYSIS

### A.  Count I – Breach of Contract

To recover on a breach of contract claim under Michigan law, Hansen must prove (1) the existence of a contract between AM General and himself; (2) the terms of the contract; (3) that AM General breached the contract; and (4) that the breach caused his injury. *Webster v. Edward D. Jones & Co., LP*, 197 F.3d 815, 819 (6th Cir. 1999). Hansen's case falters at the first element. While neither party has presented a coherent theory regarding what the contract is, Hansen's briefing does make clear that he believes the contract arises from his relationship with his employer. He argues:

> Taylor Hansen was an employee of AMG and/or GEP. AMG/GEP agreed to compensate him for his work. *There is already a contract*. We are only examining *its* terms and, here, whether or not there exists any genuine factual dispute as to the same. . . . Michigan courts have long recognized that even at will employment

9

relationships are contractual in nature and employer's offers through its policies can constitute enforceable terms of the same.

(Pl.'s Resp. Br. at 16 (emphasis added).)

The undisputed facts are that Hansen was an employee of GEP, not "AMG/GEP." While neither party has provided Hansen's employment contract, HR Vice President Minne avers that "Taylor Hansen was a GEP employee in Livonia, Michigan. Mr. Hansen was never an employee of AM General." (Minne Decl. at ¶ 9.) He also avers that while GEP adopted AM General's education reimbursement policy, it made reimbursements pursuant to the policy from GEP's own budget. (*Id.* at ¶ 5.) Hansen does not dispute that GEP, not AM General, was his employer. Instead, he responds that "[t]here is no logical reason why AMG must also be his actual employer for it to be deemed the promisor or contracting party." (Pl.'s Resp. Br. at 15.) But it is Hansen who alleges that any contractual relationship arises from his relationship with his employer. (*Id.* at 16.) AM General cannot breach a contract to which it is not a party. *See Hallett v. Gordon*, 81 N.W. 556, 556 *modified*, 82 N.W. 827 (1900) ("[I]f the defendant is correct in saying that he was not a party to the contract, there is manifestly no liability for a breach of warranty, when he made no warranty."); *see also Heidt v. Iosco Cnty. Hous. Comm'n*, No. 252673, 2005 WL 1490022, at *1 (Mich. Ct. App. June 23, 2005) (holding that the trial court properly dismissed a breach of contract claim on the basis that the defendant was not a party to the contract in question). Since AM General is not Hansen's employer, it cannot have breached a contract that arises from Hansen's employment.

Accordingly, AM General asserts that Hansen must pierce GEP's corporate veil in order to proceed on a claim against AM General. Hansen did not allege a piercing theory. But in his response he asserts that because the "commonality of interest between AM General and General Engine Products is abundantly clear," AM General should be held liable for the breach of

10

contract claim. (Pl.'s Resp. Br. at 16.) This is not enough to allow him to pierce GEP's corporate veil and hold AM General liable for GEP's alleged breach of contract.

Piercing the corporate veil is a theory that enables plaintiffs to reach past a subsidiary in order to hold its parent company liable for the subsidiary's acts. This theory "is not by itself a cause of action. Rather, it is a doctrine which fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his or her own personal business, and such liability arises from fraud or injustice perpetuated . . . on third persons dealing with the corporation." *In re RCS Engineered Products Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996) (citing 1 Fletcher Cyclopedia on the Law of Private Corps. § 41.10 at 615 (1990)); *accord Kostopoulos v. Crimmins*, No. 2010-107311-CZ, 2011 WL 6848354, at *3 (Mich. Ct. App. Dec. 29, 2011).

In Michigan, "[t]he traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations." *Foodland Dists. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. 1996). But the theory has also been applied in breach of contract claims against a parent company where the plaintiff contracted with a subsidiary. *E.g.*, *Plastics Plus, Inc. v. Fortis Plastics, LLC*, No. 12-cv-10125, 2013 WL 6547866, at *3–4 (E.D. Mich. Dec. 13, 2013); *City of Dearborn v. DLZ Corp.*, 111 F. Supp. 2d 900, 902 (E.D. Mich. 2000).

In order to pierce, Hansen must demonstrate the following elements:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

*Foodland Dists.*, 559 N.W.2d at 381. Factors relevant to whether a subsidiary is a "mere instrumentality" include

11

> if the parent and subsidiary share principal offices, if they share board members or executives, if all of the parent's revenue comes from the subsidiary's sales, if all capital for the subsidiary is provided by the parent, if the subsidiary purchases supplies exclusively from the parent, if the subsidiary is seriously undercapitalized, if the parent regularly provided gratuitous services to the subsidiary, if the parent handled the subsidiary's payroll, if the parent directed the policies and decisions of the subsidiary, and if the parent considered the subsidiary's project to be its own.

*Plastics Plus*, 2013 WL 6547866 at *5.

It is true that AM General and GEP appear to share common interests and even share some corporate officers. But this fact alone is not enough to raise a genuine issue of material fact as to the first prong of the piercing inquiry. *See Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1, 6 (6th Cir. 2003) ("Parents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations." (quoting *Fletcher v. Atec, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995)). Furthermore, Hansen has not alleged, and the Court has not been made aware of, any record items indicating that AM General used GEP to perpetrate a fraud or wrongdoing. A breach of contract could constitute "fraud or wrongdoing for the purpose of veil-piercing liability," *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 799 (6th Cir. 2007), but as will be discussed below, Hansen has not demonstrated that there was a breach of contract. Therefore, to the extent he seeks to assert a piercing theory, Hansen has not met his burden.

Summary judgment for AM General on the breach of contract claim is therefore warranted.

### B. Promissory Estoppel

Hansen's promissory estoppel claim does not rely on Hansen's employment relationship with GEP but instead on representations allegedly made to Hansen by AM General employees. (Pl.'s Resp. Br. at 26.) The Court finds, however, that this claim also fails because there was no

clear and definite promise to reimburse Hansen for full tuition for the Kellogg program, and no reasonable jury could find Hansen's reliance on such a representation reasonable.

"The doctrine of promissory estoppel is cautiously applied." *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 (Mich. 1993) (citation omitted). Courts "should apply the doctrine only where the facts are unquestionable and the wrong to be prevented undoubted." *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). The elements of promissory estoppel under Michigan law are,

> (1) a promise, (2) that the promisor reasonably should have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances requiring that the promise be enforced if injustice is to be avoided.

*Parkhurst Homes, Inc. v. McLaughlin*, 466 N.W.2d 404, 406 (1991). Moreover, "[p]romissory estoppel requires reasonable reliance on the part of the party asserting estoppel." *Northern Warehousing, Inc. v. State of Mich. Dep't of Ed.*, 714 N.W.2d 287 (Mich. 2006).

"Because promissory estoppel substitutes for the consideration required to form a contract, the promise on which a promissory estoppel action is brought must be definite and clear." *Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 827 F. Supp. 438, 442 (E.D. Mich. 1993) (citing *State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (1993)). "A promise is a manifestation of intention to act or refrain from acting in a specified manner, made in a way that would justify a promisee in understanding that a commitment had been made." *Schmidt v. Bretzlaff*, 528 N.W.2d 760, 762 (1995). "In determining whether a requisite promise existed, [courts] are to objectively examine the words and actions surrounding the transaction in question as well as the nature of the relationship between the parties and the circumstances surrounding their actions." *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (1999).

13

The record is devoid of any clear and definite promise by AM General to provide Hansen with full tuition reimbursement for the Kellogg program.  To the contrary, Hansen admits that the only explicit representations made to him were (1) Burton's phone call informing him that the company would reimburse $25,000, and (2) subsequent affirmations of that statement from AM General employees. Hansen's written communications with supervisors, his girlfriend, and Kellogg staff reflect this admission. The Court acknowledges that there may have been some "mixed opinions" (Pl.'s Resp. Br. at 9 (quoting Dkt. 20-4, Jeff Dowell E-mail to Gary Wuslich, at 1)), regarding the Policy and its application to Hansen. But "mixed opinions" do not constitute a "clear and definite promise" to reimburse tuition in excess of $100,000, especially where the AM General employees consistently stated that the maximum reimbursement would be $25,000. Furthermore, the Policy itself does not promise unlimited tuition reimbursements. Rather, it states that reimbursements are subject to prior approval and limited to two courses per term unless approved by the Vice President of Human Resources. (*See* Policy at 1–2.) And Hansen admits that he neither sought nor received such approval.

Hansen makes much of his own interpretation of the policy. But it is clear that he was aware of AM General's position limiting reimbursement to $25,000. He even informed Kellogg staff that he did not expect AM General to make any further contributions to his tuition. And, despite many meetings with AM General's staff regarding the cap, Hansen never received any assurance that he would receive more than $25,000. Hansen proceeded on the assumption that he would be reimbursed for over $100,000 in tuition expenses based solely on his own interpretation of the policy when the record reflects that every person he spoke with during this time advised him otherwise. No reasonable jury could find this to be reasonable reliance.

Moreover, AM General could not reasonably have expected that the actions of its employees would induce Hansen to act on the belief that AM General would reimburse him for over $100,000. AM General informed Hansen of the $25,000 limitation well before he applied for student loans or paid a deposit to hold his seat in the Kellogg entering class. Hansen never followed the required procedure to be reimbursed for more than two courses per term. Furthermore, AM General points out that the highest amount ever paid to an employee through the ERP program was $30,663.60. (Def.'s Br. at 4 n.3 (citing Minne Decl. at ¶ 8).) Hansen asserts, without citing evidence, that Gary Wuslich received full reimbursement for the same program. But Wuslich held an executive level position. As counsel for AM General pointed out at oral argument, there may have been different concerns regarding Wuslich's education because of his executive status. But even if Hansen's assertion about Wuslich is correct, the existence of a single executive who was reimbursed for full tuition hardly establishes a genuine issue of material fact that Hansen was induced to accrue over $100,000 in educational debt on the assumption that he would be reimbursed.

In sum, the undisputed facts reflect that there was no clear and definite promise by AM General to pay Hansen's full tuition and that AM General through its employees would not reasonably have expected Hansen to take definite and substantial action in response to the alleged promise. Hansen's promissory estoppel claim therefore fails as a matter of law.

### C. Leave to Amend

In his response brief, Hansen requests leave to amend the Complaint to add GEP as a defendant. But under this District's local rules, motions are not to be made in response briefs. *See* E.D. Mich. EFP 5(e); *see also Jung v. Certainteed Corp.*, No. 10–2557, 2011 WL 772907, *1 (D. Kan. Mar. 1, 2011) ("Generally, a plaintiff's bare request in a response to a motion to

dismiss is not a proper vehicle for seeking leave to amend .") (citing *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir.1999)); Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."). Nonetheless, the Court will address the motion in the interest of efficiency because, as will be explained, leave to amend is not warranted even assuming Hansen had requested it in the proper manner.

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend should be "freely given when justice so requires." But a court may deny leave based on undue delay, bad faith, dilatory motive, or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Sixth Circuit requires "at least some significant showing of prejudice to deny a motion to amend based solely upon delay." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2008) (citing *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986) (per curiam)).

"[A]llowing amendment after the close of discovery creates significant prejudice . . . ." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999). Indeed, requesting leave to amend after the passage of the discovery cutoff and the dispositive motion deadline imposes "an unwarranted burden on the Court" and places an "unfair burden on the opposing parties." *Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 445 (6th Cir. 2014). In this case, discovery closed on March 28, 2014, (Dkt. 14), AM General filed its motion for summary judgment on April 25, 2014, (Dkt. 16.), and the parties engaged in mediation during the summer of 2014. (Dkt. 15.) It is well past the appropriate time to amend the complaint.

Furthermore, by the time he requested leave to amend, Hansen had been on notice that AM General was not his employer for nearly ten months. On July 23, 2013, in its answer to the Complaint, AM General "admit[ted] that Hansen was an employee of General Engine Products LLC ("GEP"), a wholly owned subsidiary of AM General, in Livonia, Michigan." (Dkt, 6, Ans.,

at 3.) AM General also "admit[ted] that GEP agreed to reimburse Hansen for certain educational expenses under the terms of AM General's Education Reimbursement Program." (*Id.* at 5.) In response to Hansen's allegation that he was "a salaried employee . . . [of] Defendant," AM General stated that it "admit[ted] that Hansen was a salaried employee of GEP." (*Id.* at 6.) Thus, AM General's motion for summary judgment (filed on May 19, 2014) did not reveal anything new by arguing that Hansen had sued the wrong entity.

Moreover, the Court finds that Hansen's proposed addition of GEP as a party would be futile. "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). To withstand a motion to dismiss, a claim must "set forth factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). AM General and Hansen agree that if a contract exists, GEP and Hansen are the parties. But neither party has presented a coherent theory regarding what the contract is. At oral argument, counsel for AM General and Hansen presented an array of ideas, but ultimately, counsel for Hansen commented that it would be up to the Court to make a determination regarding this issue. The Court accepts the invitation and finds that GEP's reimbursement policy constituted an offer for a unilateral contract, but that there was no breach of contract because GEP revoked the offer and extended a new one before Hansen accepted through performance.

The threshold question for the breach of contract claim is when and how employment policies create contract rights under Michigan law. Hansen seeks to analogize the EFAP to the termination-for-cause policies at issue in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980). In *Toussaint*, the Michigan Supreme Court created an exception to

the general rule of construction providing that employment contracts of indefinite duration create an "at will" employment relationship terminable by either party. *Lynas v. Maxwell Farms*, 273 N.W. 315, 316 (1937); *see generally Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 269 (Mich. 1991) ("In [*Toussaint*], this Court joined the forefront of a nationwide experiment in which, under varying theories, courts extended job security to nonunionized employees."). The *Toussaint* exception holds that discharge-for-cause policies are enforceable, even in the absence of mutual agreement that the policies would create contract rights, because the policies "create[] a situation 'instinct with an obligation.'" *Id.* at 892. In other words, an employee's "legitimate expectations grounded in an employer's policy statements" could give rise to an enforceable right not to be terminated without good cause. *Id.*

Hansen argues that the EFAP created a legitimate expectation that he would be reimbursed for his full tuition and thereby gives rise to a contract under *Toussaint*. Despite the continuing vitality of *Toussaint*, the Court agrees with Defendants (*see* Def.'s Reply Br. at 2) that its "legitimate-expectations" holding does not apply outside the at-will employment context. *See, e.g.*, *Dumas v. Auto Club Ins. Assoc.*, 473 N.W.2d 652, 655–57 (Mich. 1991) ("Previous cases have not extended the legitimate-expectations theory to facts similar to these [where an employer amended a sales commission policy], and we decline the opportunity to extend the theory to compensation terms."); *Fischhaber v. Gen. Motors Corp., Buick Motor Div.*, 436 N.W.2d 386, 389 (Mich. Ct. App. 1988) ("*Toussaint* was strictly limited to instances of employee discharge, and we find no indication in that case that the Court intended its holdings to be expanded to include changes in job assignments.").

But *Toussaint* is not the only way for an employment policy to create contract rights. *E.g. In re Certified Question*, 443 N.W.2d 112, 118 (Mich. 1989) ("Without rejecting the

applicability of unilateral contract theory in other situations, we find [the theory] inadequate as a basis for our answer" to a certified question from the Sixth Circuit regarding when an employer may unilaterally alter a *Toussaint*-type policy). In fact, Michigan courts have expressly adopted unilateral contract theory in situations similar to Hansen's. *Holland v. Earl G. Graves Publishing Co., Inc.*, 46 F. Supp.2d 681 (E.D. Mich. 1998) (holding that a year-end bonus policy was "an announcement as to the way the company would conduct itself, and it could be accepted only by the plaintiff's performance," and plaintiff's performance under the policy created a contractual obligation on the employer's part); *Cain v. Allen Electric & Equipment Co.*, 78 N.W.2d 296, 301–302 (Mich. 1956) (holding that a policy stating that ""an 'executive' having 5 to 10 years employment should be entitled to 2 months termination pay" created an offer for a unilateral contract which the plaintiff accepted by staying at the company for over five years); *but see Klein v. HP Pelzer Auto. Sys., Inc.*, -- N.W.2d --, 306 Mich. App. 67 (Mich. Ct. App. 2014) (distinguishing between unilateral contracts and mere gratuities in the context of employment policies).

"A unilateral contract is one in which the promisor does not receive a promise in return as consideration." *Id.* at 116. "In suits upon unilateral contracts, it is only where the defendant has had the benefit of the consideration for which he bargained that he can be held bound." *Richardson v. Hardwick*, 106 U.S. 252, 255 (1882). Since the "only method of acceptance of a unilateral contract is performance," a promisor may properly revoke his offer prior to the promisee's acceptance without incurring liability for breach of contract. *Cunningham v. 4-D Tool Co.*, 451 N.W.2d 514, 517 (Mich. Ct. App. 1989) (finding no breach of contract where "defendant offered a typical unilateral employment contract in which plaintiff could accept by performance, i.e., by engaging in work at the defendant's plant" but "was told when he arrived at

19

the plant that the defendant no longer had work for him"); *see also Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 195 (Mich. 2003) ("A unilateral contract is one in which the promisor does not receive a promise in return as consideration. . . . In such circumstances, there is no contractual requirement that the promisee do more than perform the act upon which the promise is predicated in order to legally obligate the promisor.").

Here, GEP's policy offered to reimburse employee tuition for up to two classes per semester in exchange for the employee's submission of certain documentation and completion of pre-approved coursework (i.e., the performance of completing approved coursework after applying for and receiving approval from GEP served as the consideration for the contract.) That is, the policy constituted an offer (repayment of tuition in accordance with the policy) which could only be accepted by performance (submission of documents and completion of course work). Thus, the policy was an offer for a unilateral contract. *See Obike v. Applied EPI, Inc.*, No. 02-1653, 2004 WL 74167, at *8 (D. Minn. Mar. 24, 2004) (noting that an Employee Handbook providing that employees were "entitled to a 'maximum of $5,000 per year'" for "approved class work in which the employee received a grade of 'B' or better" was "sufficiently definite to establish a unilateral contract").

It is undisputed that Hansen did not properly follow the policy's requirement to submit requests for reimbursement *before* enrolling in a course. Because Hansen had not yet performed, GEP "effectively revoked its offer prior to plaintiff's acceptance," *Cunningham*, 451 N.W.2d at 517, by telling Hansen that instead of the usual procedure, it would provide him with about $25,000 worth of reimbursement. Therefore, a contract to reimburse Hansen pursuant to the terms of the Policy was never formed and GEP did not breach by paying Hansen the (approximately) $25,000 it promised. Amending the Complaint would be futile.

20

## IV. CONCLUSION

For the reasons stated, AM General's motion for summary judgment is GRANTED and Hansen's request for leave to amend is DENIED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: November 26, 2014

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 26, 2014.

s/Deborah Tofil
Deborah Tofil
Case Manager (313) 234-5122

21